Neil J. Shannon, Administrator, Appellee, v. Iroquois Iron Company, Appellant.

### Gen. No. 15,141.

MASTER AND SERVANT—*when doctrine of assumed risk applies.* If an accident result to a servant from dangers incident to his employment of which he was not ignorant and of which he was bound to know in the exercise of ordinary care for his own safety, he cannot recover.

BAKER, J., dissenting.

Action in case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the Hon. HOMER ABBOTT, Judge, presiding. Heard in this court at the October term, 1908. Reversed. Opinion filed June 2, 1910.

WINSTON, PAYNE, STRAWN and SHAW, for appellant; JOHN BARTON PAYNE and JOHN C. SLADE, of counsel.

PEASE, SMIETANKA & POLKEY, for appellee.

MR. JUSTICE FREEMAN delivered the opinion of the court.

This is an appeal from a judgment against the defendant in an action to recover for alleged negligence causing the death of plaintiff's intestate. The deceased had been employed at the time of the accident about five years as a helper upon defendant's furnaces, on one of which he met the accident causing his death. He had worked during that time alternately upon day and night shifts of two weeks each.

The declaration avers that the ordinary and usual duties of the deceased Corak were to act as keeper of a certain high furnace used by defendant for the smelting of iron, "and to look after the same and the operations thereof in the process of heating and melting iron and ore; that at the time of the accident the said furnace was in process of repair; that he was taken from his said employment and directed to assist in laboring around this furnace; that in the process of repairing the furnace a certain railing which had formerly been on the top of the furnace and certain portions of the top of the furnace had been removed, leaving holes or openings therein; that Corak did not know of the removal of the railing or of the existence of the holes or apertures; that about one o'clock A. M. of April 4, 1907, the night was dark and conditions and objects were indistinguishable without a light; that it began to rain at that time and defendant's foreman directed certain of the employes, including Corak, to go to the top of the furnace and spread a tarpaulin over the openings in the top to keep the rain from falling on the inside of the furnace. It is charged that defendant failed in its duty to exercise proper care in giving warning of the dangers caused by the removal of the railing and the existence of the openings in the top of the furnace, and that in consequence of such neglect of duty on the part of the defendant, Corak while performing his work upon the top under orders of the defendant and exercising due care himself, fell from

the top of the furnace a distance of fifty feet and was killed.

Uncontradicted evidence tends to show that upon March 14th, about three weeks before the accident, the furnace had been blown out to be cleaned and repaired, after having been running constantly over seven years. On the night of the accident the deceased came to his work about six o'clock in the evening while it was still light. He was doing some cleaning of iron upon the ground. Plaintiff's evidence tends to show that while the repairs were in progress Corak had worked three or four days about the middle of March on top of the furnace from which he fell, "a part of the time throwing the old bricks off the top." He and his fellow employes while the furnace was not running were doing "any kind of work that came up to help repair the furnace so that we could go to work on our regular jobs," as one of them testifies. "At the time he fell the brick men were working inside the furnace mouth or hopper, lining it with brick." The boiler makers had been at work two weeks, removing old plates around the top of the furnace and putting in new ones. These plates made a circular platform all around the mouth at the top of the furnace. Four of these plates had been removed and were out at the time of the accident. There were two elevators which ran from below to an elevator house on a level with the top of the furnace. In front of the elevator house was a platform or floor 22 feet wide and 17 feet long made of iron extending to and on a level with the top of the furnace and connecting the elevator with the circular platform surrounding the top. This circular platform was constructed of the iron plates above referred to, which were in process of removal and restoration at the time of the accident. The first of the removed plates left an opening which was about seven feet beyond the extreme point where the outside of the elevator platform connected with the outside of the circular platform about the furnace top.

Just before the accident, when it began to rain slightly, one of the "bosses" directed a canvas or tarpaulin to be taken to the top of the furnace to cover it and protect the workmen laying bricks inside. Five workmen, including the deceased, were sent with the canvas up to the elevator. It was dark up there, and after lighting a small light the boss went down to get a larger one and brought up a torch. Two additional "torches were lit on the top," and were "placed there so we could see well the plates. They were standing upright about one foot above the plates." The foreman held the torch he had brought. "It was a stick wrapped with waste which was dipped in kerosene oil and lighted." Two of the men began spreading the canvas over the furnace mouth. One was standing on what was the right side of the furnace to one looking forward from the elevator platform. This man testifies, "I was standing there where the plate was taken out and George was opposite me on the other side. Corak was standing at the first post where the lights were. We were all together and the foreman. I was standing and working with George. Nic Corak and Vidovic were looking at us. They were not working then. George and I were pulling the canvas." The witness states that the last time he saw Corak he was near "the first post where the three were standing, where the lights were lit." While this witness, Maric and George were spreading the canvas and Vidovic was helping a "very little" and when they had been at work not over five minutes a noise of something falling was heard. The men looked around and "saw one man was missing." The foreman called out, but got no answer. Then the men went down on the elevator. The dead body of Corak was found on the roof of a shed some fifty feet below and at the side of the furnace.

Plaintiff's witness Maric states that when the party were going up in the elevator together, the foreman "told us to look out and not fall down." When they got on the top of the furnace and it was dark the fore-

man again "warned us to watch out and not to fall in and said 'You can see some of the plates are off.' When he came back with the lighted torch he said to us, 'look out for the plates being taken out—see the plates being taken out.'" At that time "we were all standing around him close together." The witness Maric is corroborated by Vidovic, also a witness called by plaintiff. The latter says: "When we got up to the top of the furnace the foreman told us to look and not fall in anywhere. He told us to look out and watch it well and not to fall in down below, not to fall down. I heard it well. This was said when we went on the top and were all standing there close together."

It appears from Vidovic's testimony that the deceased and Maric and Vidovic were from the same country and they all, including Corak, the deceased, "spoke the same language as George and Val." The latter, Val, was the foreman, who gave the warning. The same witness on redirect examination said that "the foremen George and Val did not speak Croatian as well as we, but we understand each other very well. Their native language is Slavic." The witness Maric being recalled testified through an interpreter as follows: "I always understand whatever orders Val gives me, and the same way with George, whatever he says I understand. Why shouldn't I? He knows my language and he tells me in mine. The same was true of Corak and Vidovic. They understood also. We five men were working in the same gang a number of years. * * * Nic Corak had been working on that gang about five years at that place with these same men, Val and George. Val and George had been either workmen or foremen with him all that time."

The foreman, Valentine Smobrilla, called as a witness for the defense, testified to practically the same state of facts. He says he expressly told the men there were some plates taken out, and that they all said, "All right," that they would take care of themselves. He says he spoke Slavish to them and that "there is a

little difference between the Croatian and Slavic language.'' He had known the deceased five years, had talked much with him during that time and "understood what he said to me;'' that he talked to Corak in the Slavic language and that Corak ''spoke pretty near the same thing, spoke pretty good. I always told him what to do and he did it.'' There is other testimony, all of it corroborative of that above set forth, and tending to show that the openings left by the removal of plates were pointed out to the men there and could be distinctly seen by them. The foreman states that Corak had been on the furnace since he knocked the bricks out and five or six days before the accident.

It is contended in behalf of defendant that the deceased assumed the risk of the conditions existing; that plaintiff failed to show the exercise of ordinary care for his own safety on the part of the deceased, and to prove that the fall was caused by any act or omission of the defendant; that deceased was guilty of contributory negligence and that appellant was guilty of no negligence. If it be true that the evidence fails to show that the fall of the deceased which caused his death was the result of some negligent act or omission on the part of the defendant, it will be unnecessary to consider the other contentions. It is claimed by plaintiff's counsel that the defendant was guilty of negligence in having carelessly failed to warn Corak of the dangerous conditions at the top of the furnace. It is conceded in the brief of plaintiff's counsel that the deceased had been at the top of the furnace ''some six days before the accident, when he went up with Smotrilla, the foreman, to assist in placing some planks over the funnel of the furnace,'' and that about four days before that time and ''some ten days before the accident,'' the iron workers or boiler makers began operations at the top of the furnace, removed the railing and started to replace the iron plates of the platform with new ones. He had worked there previously also. That Corak could have done the work of placing

planks over the furnace without noticing that the iron workers were engaged in removing old plates and substituting new ones, there is no evidence tending to show and is not reasonable to suppose. That he could have worked anywhere as he did about that furnace which for five years he had been familiar with, and have remained ignorant of the fact that the work of tearing down and rebuilding was going on at the top as well as elsewhere, it is not easy to believe. The openings left where old plates were taken away must have been visible from below to one looking up at any time. But we are not left to conjecture as to his having been warned. The uncontradicted testimony of practically all the witnesses present at the time of the accident tends to show that he and the others were directly warned by the foreman at the time that plates were out and that they must all be careful not to fall. That the deceased was ignorant of the dangers there is no evidence to show and no evidence of circumstances from which it can be inferred. There is affirmative evidence tending to show he could not have been so ignorant. The burden of such proof of ignorance was upon the plaintiff. In Swift v. Gaylord, 229 Ill. 330-340, it is said: "Knowledge or want of knowledge of a defect may be inferred from the circumstances, but by whatever evidence the fact must be shown the burden of proof in that regard rests upon the plaintiff."

A fatal defect in the plaintiff's case is that the evidence entirely fails to show how or why or where the deceased fell. No one saw him fall and the first knowledge of it his companions had was when something was heard to strike on the roof below. The foreman at first thought his men had carelessly knocked something down, and it was not until it appeared the deceased was no longer on the furnace with them that the truth came to be known. Whether he fell through an opening where a plate had been removed or over the outer edge of the platform the evidence fails to disclose. The place where the body was found throws no light on

what part of the top of the furnace he fell from. The deceased for aught that appears may have fallen because of an attack of vertigo or for other reasons for which the defendant would be in no way responsible. There is no evidence tending to show whether or not the deceased was in the exercise of due care for his own safety. In the absence of such evidence to affirm this judgment would be to base the affirmance on mere conjecture, which cannot supply the place of evidence. What is said in C. & A. R. R. Co. v. Crowder, 49 Ill. App. 154, 161, is in point. In Calumet Iron & Steel Works v. Martin, 115 Ill. 358, cited in the case above referred to, it was said: "From the earliest reported case in our reports where the question was passed upon to the present time, a period of more than thirty years, the general rule has been declared and recognized in opinions announced from time to time that in order to recover for injuries from negligence, it must be alleged and proved that the injured party was at the time he was injured observing due or ordinary care for his own safety."

This case in an illustration of the now quite generally accepted view that the burden of the consequences of an accident of this character should not be left to fall alone upon the family of the deceased, but should be borne in part at least by the community which benefits by the use of appliances adding to the common prosperity, but which in so doing take their toll of human life and limb. The defendant however cannot be made to assume this burden in a case where the evidence and law do not warrant its imposition.

The judgment of the Superior Court must be reversed.

*Reversed.*

MR. JUSTICE BAKER dissenting.